E-FILED
Thursday, 27 July, 2006  04:04:01 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DONALD A. LEHN,

       Plaintiff,

   v.                                              04-CV-3100

STEVEN C. BRYANT, Graham Warden,


Order

Before the Court are:

   1) the defendants' motion for summary judgment (d/e 59), the plaintiff's responses thereto (d/e's 64, 66), and the defendants' reply (d/e 67);

   2) the plaintiff's motion to compel (d/e 63) and the defendants' response thereto (d/e 64); and,

   3) the defendants' motion to strike (d/e 71) and the plaintiff's response thereto (d/e 72)

   For the reasons below, the Court grants in part and denies in part the defendants' summary judgment motion.  After this order, the only claims remaining are:  the defendants' refusal to allow the plaintiff's pattern books violated and/or violates his First Amendment rights; and 2) Defendant Greenwood retaliated against the plaintiff for the exercise of the plaintiff's protected First Amendment rights.

Undisputed Facts

   1.  In April, 2002, the plaintiff was incarcerated in Graham Correctional Center.  The plaintiff received five iron-on pattern books in the mail, that had been ordered for him by his brother.  Prison officials refused to give the books to plaintiff for the stated reason that the patterns could be used to make tattoos.  (d/e 59, Ex. 15).

   2.  In May, 2002, the plaintiff received approval for the books from the IDOC Central Publication Review Committee.  *Id.*  However, Graham's Warden, defendant Bryant, still refused to allow the plaintiff his books.  Nor would Bryant allow the plaintiff to return the books for a refund or send the books to someone else outside the prison.

   3.  September, 2002, the plaintiff filed an action for replevin in Montgomery County Court, seeking the return of the books, or an order allowing him to return them to the sender.

(d/e 59, Ex. 13).[1]

4.  In February, 2003, defendant Bryant filed an amended affidavit in the replevin action, as part of an amended motion for summary judgment.(d/e 34, p. 17).[2]   In the affidavit, Bryant averred that he had the authority to follow or not follow the recommendations of the Central Publication Review Committee, and that he had overruled the Committee's decision to allow the plaintiff to possess five iron-on transfer books.  Plaintiff apparently believed that Bryant's affidavit was a contrived attempt to win summary judgment based on false and/or self-serving statements.

5.  A hearing on the amended motion for summary judgment in the replevin action was held on March 8, 2003.  (d/e 34, "Criminal Complaint," p. 8).

6.  Out of frustration from waiting for the replevin court's ruling and Bryant's conduct in the replevin action, the plaintiff filed supplemental materials in support of his replevin action (d/e 34, "Criminal Complaint," p. 10).  He included in the copy sent to the Illinois Attorney General a note that stated:

> When I was sentenced to imprisonment in the IDOC, the Judge at the time told
> me that I was to learn to obey the law. I sure am not going to learn how by
> observing you and prick who runs this prison. Isn't perjury a crime? (Defendants'
> exhibit 1; Plaintiff's dep. pp. 10-12; d/e 34, "Criminal Complaint p. 11).

7.  The Illinois Assistant Attorney General faxed the letter to Graham Correctional Center, where the letter eventually made its way to Lt. Brookshire of Internal Affairs. (d/e 59, Affidavit of Bryant).

8. On the morning of May 12, 2003, the plaintiff was taken to segregation, with no explanation and no chance to pack and inventory his property.  (d/e 34, p. 12).  That evening, the plaintiff received two disciplinary reports.  One was written by Defendant Brookshire, charging the plaintiff with insolence and intimidation/threats, based on the plaintiff's letter to the Attorney General calling the Warden a prick. (Defendants' exhibit 2; Bryant Affidavit; Plaintiff's dep. p. 13, l. 1 - 15).  The second was written by Defendant Greenwood, charging the plaintiff with unauthorized and excess property in his cell. (d/e 34, Appendix, p. 31).

---

[1]The court takes these allegations as true for purposes of this order–they are set forth to establish background.

[2]Doc. 34 is the "Appendix to Criminal Complaint" the plaintiff refers to in his responses to the summary judgment motion.  Doc. 34 has not been scanned in electronically, due to its voluminous content.  For purposes of this order only, the Court takes as true the plaintiff's description of what happened in the replevin action.  The description is set forth mainly to establish a time line and provide background.

2

9. On May 13, 2002, the plaintiff wrote a letter addressed to Warden Bryant, stating in relevant part (d/e 59, Ex. 10):

> I am writing this from seg where you were so kind to send me.
>
> By your reaction it is apparent that you truly are ignorant of the law. I fail to understand how someone so incompetent got to be warden. Apparently it must be an affirmative action quota thing.
>
>         \*          \*          \*
>
> Until now, it wasn't a high priority for me to spend the $150 filing fee just to show you were and are incompetent. Now I'm going to enjoy dancing with you and Mr. Taylor in federal court as we have done so locally.
>
> Hopefully, I can cause enough consternation among your supervisors so that they will fire you for your incompetence and for wasting the state's money over such petty bullshit.
>
> I should tell you that I have never found anyone who is as big of an asshole as I am. You will soon learn that I am a tenacious son of a bitch too.
>
>         \*          \*          \*

10. On May 13, 2006, Correctional Officer Price confiscated the May 13th letter in the plaintiff's cell and wrote a disciplinary ticket against the plaintiff for insolence (304) and intimidation/threats (206) based on that letter. (d/e Ex. 6). Specifically, the report states:

> On the above date and time [5/13/03, 10:45 a.m.] this c/o was giving inmate Lehn his chow. At that time this c/o took a letter out of Lehns door. The Letter was not in a envelope. This c/o looked threw the letter and seen it was for warden Bryant. This c/o seen in the letter that it was intimidating and threatening towards warden Bryant. So at that time this c/o gave the letter to Ass. Warden Beck.

(D/e 59, Ex. 6)(sics not noted). The plaintiff's May 13th letter was never attached to the May 13th disciplinary report.[3]

11. On May 13, 2003, the plaintiff was approved for a transfer from Graham Correctional Center to Pinckneyville Correctional Center. The transfer documents state the reason as: "Inmate Lehn is being submitted for transfer to Pinckneyville CC upon administrative request for making inappropriate comments to the Warden. IDR will follow." (d/e 59, Ex. 17).

---

[3]The plaintiff asserts this, which the Court accepts as true for purposes of this order.

12.  On May 14, 2003, after learning of his imminent transfer to Pinckneyville, the plaintiff wrote another letter to Warden Bryant (d/e 59, Ex. 5):

> They just told me that I'll be shipped out tomorrow.  I guess when you have no chance of winning in court because your lies have been exposed you have to do what you have to do.  As they say, "Power corrupts."

> I am going to file [a] fed civil rights 42 U.S.C. § 1983 suit against you as soon as I get where I'm going.

> As I said in my last missive, you made a big, big mistake by not notifying me that you had overruled the CPRC and by not notifying the CPRC or allowing me to send the books back to the sender.

> Even if you had the right to not allow me to have the books you still had no right to just keep them as you did.

> By submitting the affidavit to court as you did you fucked yourself royally.  Without that affidavit I probably wouldn't have a case against you. . . .

> Hopefully the new director will see the mess you are causing the IDOC and the amount of money you are costing the state and will fire your ass.

> Rest assured, you have not heard the last of me.  Warden Holmes shipped me from BMRCC 4 years ago and I am still giving him grief in court.  He, like you, thought he was above the law.  He didn't realize just how tenacious I am.

> *                    *                    *

> Rest assured, you will be hearing from me for a long while to come. . .

> I hope you don't take this personally. It's just that I don't think that you are qualified to be warden let alone a dog catcher.

>                                         With all <u>due</u> respect [emphasis in original],

>                                         Don

p.s.  If you think what I wrote in my note to B.Paul Taylor was disrespectful, you should hear what your own officers say about you behind your back. . .

13.  Officer Myers wrote the plaintiff a disciplinary ticket for insolence on May 14, 2003, based on the May 14th letter (d/e 59, Exhibit 8).  The May 14th report states:

4

On the above date and approximate time [5/14/03 at 10:00 a.m.], this R/O was
reviewing a letter sent from inmate Lehn B72472 to Warden Steven Bryant.  The
letter uses several curse words toward Warden Bryant directly.  This action places
Inmate Lehn B72472 in violation of Rule 304-Insolence.  (Letter is attached).

14.  The plaintiff was not served with the May 14th disciplinary report until May 21, 2003
(at the Adjustment Committee hearing).  The plaintiff waived 24-hour notice.  (d/e 59, Ex. 8).

15. On or around May 14-15, 2002, the plaintiff was transferred to Pinckneyville
Correctional Center.  According to the IDOC website, Pinckneyville is classified as a "secure
medium facility" and Graham is a "medium facility." For purposes of this order, the Court
accepts as true the plaintiff's description of Pinckneyville as a far less desirable prison from an
inmate's perspective--more restrictive, with more problematic and violent inmates.

16.  The plaintiff asserts that his transfer to Pinckneyville was in retaliation for his
replevin action.  Defendants assert that Plaintiff was transferred to Pinckneyville because of his
behavior and disciplinary tickets.  Defendant Bryant, the Warden at Graham, avers:

It is imperative that the Warden, and others in command within a prison setting,
maintain order and discipline among the inmates in their charge.  If Mr. Lehn
were to continue his behavior while remaining in the institution, it would have
served to undermine my authority and the authority of those under my command,
and if tolerated, would have created a danger for both staff and inmates.

Because of his behavior and subsequent disciplinary tickets, Mr. Lehn was
transferred to another medium security institution, Pinckneyville Correctional
Center, where any continued insolence directed to me or my staff, while still a
violation of Departmental rules, would not tend to create quite the same security
risk as the same behavior would create at Graham.

(Bryant Aff., attached to d/e 59, ¶¶ 11-12).

17.  On May 21, 2003, after the plaintiff had been transferred to Pinckneyville, the
Adjustment Committee held hearings on all four disciplinary tickets the plaintiff had received at
Graham (May 12th, 13th and 14th).  The Adjustment Committee hearing lasted from about 2:10
until 2:20 p.m. and was presided over by defendants Klindworth & Fernandez.  The plaintiff
asserts that he asked for copies of his letters before the hearing in order to prepare a defense, but
that his requests were refused.

18.  The hearing on the May 12th disciplinary report for insolence & intimidation/threats
(note to the IAG calling the Warden a prick) was held at 2:10 p.m., May 21, 2003.  (d/e 59, Ex.
3).  The Committee found the plaintiff guilty of insolence, but deleted the charge of
intimidation/threats.  The Committee recommended Plaintiff received one month segregation and
demotion to C grade for one month.  The recommendation was approved by the Warden and

5

upheld on appeal by the Administrative Review Board (d/e 59, Exhibits 3 & 4).

19.  The hearing on the May 12th disciplinary report for contraband/unauthorized property was held at 2:15 p.m., May 21, 2003.  (d/e 34, Appendix, p. 40).  The plaintiff was found guilty and received a verbal reprimand.

20.  The hearing on the May 13th disciplinary report was held at 2:18 p.m., on May 21, 2003.  (d/e 59, Ex. 7).  The plaintiff's May 13th letter was not attached to the May 13th report. According to the plaintiff, he asked to see the letter but was told the letter was not with the ticket and was not available.  Klindworth allegedly denied the plaintiff's request for a continuance until a copy of the letter could be obtained.  Klindworth also allegedly said that he did not need to see the letter to know that the plaintiff was guilty.  (d/e 34, Criminal Complaint, p. 23).  Although the May 13th report regarded the May 13th letter (calling the Warden incompetent and ignorant of the law), the Adjustment Committee Summary recounted statements in the May 14th letter as the basis for the guilty finding.  Specifically, the Adjustment Committee Summary on the May 13th ticket states:

> Inmate read the letter out loud, which is addressed to Warden Bryant . . .The following statements were in the letter, "By submitting the affidavit to the court as you did you fucked yourself royally.""Rest assured, you will be hearing from me for a long while to come.""It's just that I don't think you are qualified to be a dog catcher let alone a warden."

(d/e 59, Ex. 7)(Incident #200301950).  The Adjustment Committee found the plaintiff guilty of insolence and intimidation/threats based on these statements (d/e 59, Ex. 7).  The plaintiff lost one month of good time credit, received three months segregation, and one month grade demotion.  *Id.*  On appeal, the Administrative Review Board recommended that the May 13th disciplinary report be rewritten to substantiate the charge and reheard.  (d/e 59, Ex. 4).  The ARB did not explain why.

The May 13th disciplinary report was reheard on October 18, 2003.  (d/e 59, Ex. 11).  The record states:

> **IDR rewritten, reserved and reheard per inmate issues to substantiate charges.
> Original IDR was heard under incident #200301950.
> **All discipline as a result of this rehearing has been served by inmate.
> IDR read to inmate.
> Inmate pled not guilty stating "I wrote the A/G and told them to tell the "Prick" (Warden) to obey the law.  I wrote the letter and did make the statements towards the Warden."

BASIS FOR DECISION

. . .

Reporting officer's report stating that he took a letter which was written by Lehn and stated "The new Director will see how much you are costing IDOC and the amount of money you are costing them will fire you [sic] ass.""Rest assured you will be hearing from me for a long time to come."  (d/e 59, Ex. 11).  The same punishment was imposed.  *Id.*

On December 16, 2003, the Administrative Review Board upheld the all the discipline, but recommended that the charge of intimidation/threats be deleted (Exhibit 12).

21.  The May 14th disciplinary report was served on the plaintiff at the Adjustment Committee hearing, and a hearing on the May 14th disciplinary report was held at 2:20 p.m. (d/e 59, Ex. 8& 9)(the plaintiff waived notice).  According to the plaintiff, he was asked to read the May 14th letter out loud, and had to explain to defendant Klindworth was a "missive" was.  (d/e 34, Criminal Complaint, p. 24).  In answering that question, the plaintiff explained that the word "missive" in his May 14th letter referred to his May 13th letter.  The plaintiff also asked how the charge of insolence could be applied to a letter, instead of to a charge of dangerous communications (208) or dangerous written material (209), but the Adjustment Committee members refused to answer.

The record of proceedings for the May 14th report states:

Inmate stated the letter in question was the same letter referred to on IDR #200301950, written the day before by C/O Price.  On that basis, the May 14th ticket was expunged.  (d/e 59, Ex. 9).

The plaintiff, however, asserts that he never told the committee that the May 14th ticket was based on the same letter as the May 13th ticket.[4]  The Court accepts that assertion as true for purposes of this order.

22.  On May 27, 2003, the Montgomery County Judge ruled in favor of the IDOC in the plaintiff's replevin action.  (d/e 59, Ex. 13).  The reasons why are not clear–the docket sheet from that proceeding says " . . . evidence heard on petitioner's complaint.  Complaint denied for reasons stated on record . . ."  (d/e 59, Ex. 14).  The plaintiff appealed that decision in June, 2003, but around the end of July, 2003, filed a motion to withdraw his appeal.  (Ex. 13, 14, 15).  In that motion he explained he was withdrawing the appeal for two reasons: 1) he had no access to his legal papers or to civil law material in the law library due to his transfer and segregation in

---

[4]The Court accepts this assertion made by the plaintiff as true, for the purposes of this order.

Pinckneyville; and 2) he believed the First Amendment issues were better addressed in federal court (d/e 59, Ex. 15).

23. Lt. Gabeau did not have any duty to answer grievances.  Grievances are answered by counselors, grievance officers, and the Warden or the Warden's designee.  (d/e 59, Gabeau affidavit).

24. Plaintiff was given assistance with legal documents, his legal box, or copies on May 22, 2003, June 6, 2003, June 12, 2003, June 19, 2003, June 26, 2003, July 24, 2003 and July 31, 2003 (d/e 59, Exhibit 16).  The plaintiff maintains this is immaterial, as he was denied access to his large property box, the box that contained the legal papers he needed.

25. Plaintiff refused library assistance on July 18, 2003, July 22, 2003, July 3, 2003, July 4, 2003, July 8, 2003, and July 1, 2003.  (d/e 59, Flagg affidavit).  The plaintiff says this is immaterial, as the library does not contain civil law materials and was therefore useless regarding the replevin action.

26. Plaintiff did not ask the Illinois appellate court for additional time or for a stay of proceedings pending his ability to fully access his documents (d/e 59, Plaintiff's dep. p. 91, l. 10-12).

27. Plaintiff received his legal documents two to three weeks after he moved to dismiss the appeal.  (d/e 59,  Plaintiff's dep. p. 93).

28. Plaintiff admits he did not know if either defendant Pierson or defendant Flagg received his grievances about access to his documents.  (d/e 59, Plaintiff's dep. p. 91). Plaintiff's grievance regarding his property box was handled by counselor Linda Fritts and grievance officer Wilbur Pursell.  (d/e 59, Exhibit 15).  Fritts and Pursell indicated in their response that the plaintiff would receive access to his property to which he was entitled.   (d/e 59, Exhibit 15).

*Analysis*

**I.The plaintiff's discipline for his letters did not violate the plaintiff's Constitutional  rights.**

### A.      First Amendment: Free Speech and Right to Petition for Redress of Grievances

It is well settled that prison officials may discipline inmates for insolent, disrespectful and/or threatening language in written communications to prison officials (or intended for prison officials).  In *Ustrak v. Fairman*, 781 F.2d 573, 579 (7th Cir. 1986), the Seventh Circuit upheld an inmate's punishment for violating a regulation forbidding, among other things, disrespect or insolence.  The inmate in *Ustrak* had written a letter describing prison officers as "'stupid lazy assholes'" and challenging them to "'bring their fat asses around the gallery at night.'"  781 F.2d

8

at 580.  The Seventh Circuit held that "[i]f inmates have some First Amendment rights, still they have only those rights that are consistent with prison discipline . . . We can imagine few things more inimical to prison discipline than allowing prisoners to abuse guards and each other.  The level of violence in American prisons makes it imperative that the authorities take effective steps to prevent provocation."  *Id.*

The plaintiff seems to concede that the letters were insolent–they were (or at least the prison officials acted within Constitutional bounds in concluding they were).  The plaintiff argues instead against the charges that the letters were threatening or intimidating.  He says the bogus threat/intimidation charges were intentionally added in order to justify his placement in segregation as a security threat and his transfer to Pinckneyville.[5]

The Illinois Administrative Code defines intimidation or threats as  "Expressing by words, actions, or other behavior an intent to injure any person or property that creates the reasonable belief that physical, monetary, or economic harm to that person or to another will result."  20 Ill.Admin. Code 504 App. A.  The plaintiff was charged with intimidation/threats for his note to the Illinois Attorney General calling the Warden a prick, and for his May 13th letter stating the plaintiff's intent to "cause enough consternation among your supervisors so that they will fire you for your incompetence."

There is a reasonable argument that these letters were not intimidating or threatening within the meaning of the IDOC regulation.  The ultimate deletion of these charges by prison officials supports that argument.

But, interpretation of the letters is in the eye of the beholder.  The fact that the Adjustment Committee (or a Court) in hindsight do not view the letters as intimidating or threatening does not render those charges unconstitutional, or even suspicious on the facts of this case.  The tone of the letters could have reasonably been construed as an escalation of animosity by the plaintiff toward the Warden–a  warning shot to the Warden that the gloves were off–"fighting words."  The letters could be reasonably construed as challenge to the Warden's authority and a threat to his effectiveness, because they sought to diminish respect for the warden by his employees and by the Illinois Attorney General. The letters further suggest that plaintiff 's frustration with Bryant's actions in the replevin action was causing the plaintiff to lose his grip on his anger and his ability to control his actions–which allows a reasonable belief that harm to the Warden might ultimately result.  Brookshire and Price acted within Constitutional bounds in charging the plaintiff with intimidation/threats, regardless of the ultimate disposition of that charge.  Further, the plaintiff has no evidence that the intimidation/threat charges were motivated by retaliation for any of the plaintiff's First Amendment activities (see discussion below).

_____

[5]The plaintiff submits no evidence that he would not have received segregation and a transfer without the intimidation/threat charge.  The insolence charge alone would have supported those actions.

**B.      Fourteenth Amendment: Procedural Due Process; Fifth Amendment (Double Jeopardy)**

The plaintiff lost good time for the statements in his May 14th letter.  Before that loss was imposed, he was entitled to procedural due process protections as set forth in *Wolff v. McDonnell*, 418 U.S. 539 (1974).[6]  The minimum requirements of procedural due process are: sufficient advance written notice in order to inform the prisoner of the charges and to enable the prisoner to marshal the facts and prepare a defense; an impartial decision maker; an opportunity to call witnesses and present documentary evidence, if consistent with the prison's safety and correctional goals; and, a written statement by the fact finders as to the evidence relied on and reasons for the disciplinary action. *Wolff v. McDonnell*, 418 U.S. 529, 94 S.Ct. 2963 (1974).

The plaintiff's challenge is based on: 1) The plaintiff did not receive adequate notice of the May 13th charge because he never received a copy of the May 13th letter; 2) the May 14th charge, based on the May 14th letter, was expunged; 3) because the May 14th charge was expunged, the plaintiff could not be punished for the May 14th letter; 4) the punishment for the May 13th report was for the May 14th letter.

It does appear that Adjustment Committee members used the wrong letter in finding the plaintiff guilty of the charges in the May 13th disciplinary report.  The May 14th report was expunged because the Committee concluded, mistakenly, that the May 14th letter was the basis for both the May 13th and May 14th disciplinary reports.

The Committee's error is not a Constitutional one.  The bottom line is that the plaintiff was punished for his May 14th letter.   The plaintiff waived notice on the insolence charges regarding his May 14th letter–so there is no notice problem with charges of insolence on the May 14th letter.  He read the May 14th letter out loud at the hearing and had an opportunity to argue why it was not insolent.  In fact, the plaintiff arguably "lucked out," because he escaped discipline for the May 13th letter because of the Committee's mistake. [7]

---

[6]Arguably, the plaintiff's primary due process challenge is lack of notice, which does not necessarily imply that his good time should be restored. *Clayton-El v. Fisher*, 96 F.3d 236, 243-44 (7th Cir. 1996)(failure to give notice of prison disciplinary hearing immediately cognizable regardless of outcome of disciplinary hearings).  Accordingly, the Court will treat the procedural due process claim as not barred by *Heck v. Humphrey*, 512 U.S. 477, 484-487 (1994), and progeny, though that issue may be subject to reasonable debate.

[7]The plaintiff might have had a better argument if the guilty finding for intimidation had been allowed to stand, because he was not charged with intimidation for the May 14th letter.  But, the intimidation charge was ultimately deleted by the Administrative Review Board, thus correcting any potential problem. *See Morrissette v. Peters,* 45 F.3d 1119, 1122 (7th Cir. 1995)("no denial of due process if the error the inmate complains of is corrected in the administrative appeal process., thus curing any notice problem.").

Plaintiff also argues that, "Since the May 14, 2003 disciplinary report-and attached letter-were expunged . ..using this letter as the basis of the rewrite of the May 13, 203 disciplinary report instead of the <u>real</u> May 13, 2003, letter . . . was improper and a violation of Lehn's Fifth Amendment rights against double jeopardy.  The failure to attach the letter to the Disciplinary Report or to make it available to Lehn or the Adjustment Committee was a <u>Brady</u> violation" and constituted double jeopardy." (d/8 68, p.3).

Prison disciplinary proceedings are not criminal proceedings, and do not require the same protections to the accused as criminal proceedings do.  *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).  Due process in prison disciplinary proceedings does require disclosure of exculpatory evidence subject to institutional concerns, *Rasheed-Bey v. Duckworth*, 969 F.2d 357 1992), but the May 13th letter is not exculpatory evidence.  In any event, the Committee did not punish the plaintiff for the May 13th letter.  Further, the double jeopardy clause does not prevent successive prison disciplinary hearings, even if an inmate is acquitted at the first hearing (which the plaintiff was not).  *Meeks v. McBride*, 81 F.3d 717, 722 (1996). [8]

## II.    The plaintiff's retaliation claim fails, except for his claim regarding Defendant Greenwood, because Greenwood does not move for summary judgment on this claim.

### A.  Insolent Letters

As discussed above, the plaintiff says that bogus threat/intimidation charges were intentionally added in order to justify the plaintiff's placement in segregation as a security threat and to justify his transfer to Pinckneyville.  In both reports the intimidation/threat charge was ultimately deleted, though the punishment stood based on the insolence charge.

Also discussed above, charging the plaintiff with intimidation/threats did not, alone, violate the Constitutional.  But, acts which are constitutional may become unconstitutional if done in retaliation for the exercise of the plaintiff's First Amendment rights.  *See DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 1999)(citations omitted).

The record does not support an inference that Brookshire or Price were motivated by retaliation when they charged the plaintiff with intimidation/threats.   The timing is not

---

[8]The plaintiff also argues that 730 ILCS 5/3-6-3© is unconstitutional because it prevents inmates who have 30 or fewer days lost from obtaining relief from the PRB and thus shielding IDOC employees from Section 1983 suit.  That is not what the section says, but, in any event, the question is not relevant to this case.

Under Il law, no way for inmate with less than 30 days good time revoked to obtain meaningful relief (d/e 68, p. 19-20)

suspicious-- the plaintiff's debate with Warden Bryant about the books had already been going on for over a year, and the replevin action had been going on for nearly eight months.  The disciplinary report followed on the heels of the plaintiff's notes and letters, not on the heels of any protected First Amendment activity.  Similarly, there is no evidence that the May 14th report (which charged only insolence) was motivated by retaliation–it was written the same day the plaintiff wrote his indisputably disrespectful letter to the Warden.

Even if the record allowed an inference of retaliatory motive, the claim would still fail. "[T]he ultimate question is whether events would have transpired differently absent the retaliatory motive . . ."  *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996).  The plaintiff has no evidence that the adverse events would not have happened, regardless of retaliatory motive. Prison officials had a legitimate penological reason for punishing the plaintiff for his notes and letters regardless of retaliatory motives they might have harbored.  Allowing the plaintiff's letters and note to go unpunished would hold the Warden up to ridicule and a loss of respect and authority as to both inmates and other officers.  A Warden  without the respect and authority of inmates and officers is a threat to the security of the institution–potentially leading to a general breakdown of the authority and effectiveness of the Warden, deleterious effects on officer morale, and encouragement to other inmates to engage in similar behavior.  The plaintiff's punishment and transfer were thus reasonable responses to legitimate prison concerns and would have occurred regardless, at least on this record.

## B.  Dirty Laundry

The plaintiff alleges that on March 8, 2003, the day after the defendants purportedly lost their summary judgment motion in the replevin case, he awoke to discover that the clothes he had left out for the laundry porter had not been washed.  Defendant Gabeau allegedly denied the plaintiff's request to use the laundry machine, berating the plaintiff for being a "jailhouse lawyer."  Gabeau allegedly told the plaintiff that he did not care about the plaintiff's dirty clothes, and that the plaintiff could wear dirty clothes for another week.  The plaintiff filed a grievance, but it was never answered.

Gabeau avers that he does not remember the plaintiff.  (d/e 59, Gabeau Aff. ¶2).  He is, however, familiar with how laundry is done at Graham:  "Inmate laundry schedules are posted in each housing unit.  If an inmate misses their assigned laundry day, they must wait until their next assigned day.  Inmates who are not assigned as housing unit laundrymen are not allowed to use the washing machines, and Mr. Lehn would have been informed of that had he requested to use the machines."  *Id.* ¶¶ 3-4.  Gabeau further avers that he could not have refused to answer the plaintiff's grievance, because answering grievances was not part of his job.

The plaintiff does not dispute these assertions, responding:

In regard to the claim against Lt. Gabeau, Lehn's complaint is not so much that Lt. Gabeau wouldn't let him wash his clothes, it is that Lt. Gabeau lectured him on being a "Jail-house lawyer" while denying Lehn's request to use the washing

machine.  Since filing a grievance and exhausting administrative remedies is
required by the Prison Litigation Reform Act, Lehn had to include the failure to
answer his grievance as part of his complaint in order to have it not automatically
dismissed . . .

(d/e 68, p. 11).

Based on the response, it is not clear if the plaintiff intends to pursue a retaliation claim
against Gabeau.  The Court wonders whether the denial of one request to use the washing
machine is too *de minimus* to support a Constitutional retaliation claim.  *See Thaddeus-X v.
Blatter*, 175 F.3d 378, 395 (6th Cir. 1999)(For purposes of retaliation claim, "adverse action" is
"one that would 'deter a person of ordinary firmness from the exercise of the right at stake.'").
No matter, for the plaintiff does not dispute that inmates are not allowed to use the machines
unless they are assigned to do so.  Thus, the denial would have occurred anyway, even if
Gabeau's refusal was animated by retaliation.

### C.    Defendant Greenwood: Mishandling/confiscation of  Property and May 12th Disciplinary ticket

The plaintiff alleges that, on May 9, 2003, the Illinois Attorney General faxed the
plaintiff's note to Warden Bryant, and informed Bryant that the summary judgment motion had
been denied and that a trial was set for May 27, 2003.  (d/e 34, Criminal Complaint, p. 11).  That
day, the plaintiff's cell was allegedly searched, but no contraband was found, as evidenced by a
shakedown slip.  *Id.*

The plaintiff maintains that Greenwood's May 12th disciplinary report for
unauthorized/excess property was bogus and in retaliation for the plaintiff's replevin action and a
letter to Governor Blagoevich.  He points to the fact that he had all the purported contraband in
his cell during the May 9 search, but was issued no ticket that day.   He further alleges that
Greenwood stole some manilla folders with important legal cites, and tossed his legal papers
haphazardly into the bottom of his large property box, rather than into his legal box, and
intentionally re-packed items in such a way that they did not fit in the boxes. (d/e 34, Criminal
Complaint, p. 15).

The defendants do not address this claim in their summary judgment motion, so the court
does not address it.  To ensure a justiciable claim exists for trial, defendant Greenwood will be
directed to file a summary judgment motion.

### D.  Transfer to Pinckneyville

The plaintiff asserts that the real reason for his transfer was retaliation for his replevin
action and to hinder him from prevailing in that action.  He says that the replevin Judge could
not order Bryant to give back the books if the plaintiff  was no longer at Graham.

13

For the same reasons set forth in section IIA above, no reasonable inference arises that the plaintiff was transferred out of retaliation for his replevin action or any other First Amendment activities. His transfer was the result of his note to the Illinois Attorney General calling the Warden a prick and his May 13th letter calling the Warden incompetent and ignorant of the law. His insolent May 14th letter also did not help matters, only further proving that the transfer in place was justified. As to his replevin action, the plaintiff does not explain how his transfer would have mooted his replevin action–he did not get the books at Pinckneyville either. In any event, even if the transfer was motivated in part because of the replevin action, it was justified by legitimate penological reasons (the insolent letters and notes), as discussed above, and would have occurred regardless.

### E.  Denial of Access to Legal Papers in Pinckneyville

The plaintiff clarified in his deposition that this denial is not part of his retaliation claim, but is part of his access claim. (d/e 59, Plaintiff's Dep. p. 92-94). However, his inability to access his legal documents timely is attributed to systemic ineptitude and incompetence, not retaliatory motive. *Id.* In any event, he offers no evidence to support an inference that the difficulty and delay in obtaining his legal papers in Pinckneyville was attributable to any retaliatory motive arising from his replevin action or letters written in Graham.

### F.  Failure to Answer Grievances

It appears that the plaintiff mentions the failure to respond to his grievances in order to show that he did exhaust available administrative remedies, rather than as part of his retaliation claim (d/e 68, p.11). If he does intend it to be part of his retaliation claim, there is no evidence that any of the defendants were responsible for failing to answer his grievances. As discussed above, Gabeau did not have that duty. That is the counselor's duty, in the first instance, and then the grievance officer's, none of whom are named as defendants.[9]

### III.   The plaintiff's access-to-the-courts claim fails because there is no reasonable inference that he was blocked from litigating a nonfrivolous case.

"[A] right to access-to-courts claim exists only if a prisoner is unreasonable prevented from presenting legitimate grievances to a court; various resources, documents, and supplies merely provide the instruments for reasonable access, and are not protected in and of themselves." *Ortloff v. United States*, 335 F.3d 652, 656 (7th Cir. 2003)(general allegations that destruction of legal papers prejudiced pending lawsuits did not state a claim).

The plaintiff asserts that he was unable to effectively litigate the replevin action because Graham did not have the federal reporter volume containing the case *Aikens v. Jenkins*, 534 F.2d

---

[9]Contrary to the plaintiff's assertion, the Prisoner Litigation Reform Act does not require prisons to implement effective grievance procedures.

75 (7th Cir. 1976), and the inability to access unspecified legal documents in Pinckneyville before the hearing in the replevin court. According to the plaintiff, his inability to cite this case caused his defeat in the replevin action, because it precluded him from convincing the Judge that *Procunier v. Martinez* applied to published materials as well as mail. He also says he had no access to the legal materials he needed to finish his pre-trial brief.

The court observes that the plaintiff's own materials show that he did cite *Aikens,* along with many other cases, to the replevin court. (d/e 34, Appendix, pp. 5-6). In any event, the inability to obtain one case does not amount to a denial of access. Further, the plaintiff was only without his legal documents for 12 days before his replevin hearing, which had been going on since September 2002. The plaintiff, by his own account, submitted supplemental materials in support of his replevin action on May 5, 2003 (d/e 34, Criminal Complaint, p. 10), appeared in Court on May 27, 2003, and argued the merits of his Complaint. He argued that the pattern books posed no threat to security, that he had been allowed other pattern books, and that inmates were allowed similar items that posed as much if not more of a threat for tattoos than the pattern books. (d/e 34, Criminal Complaint, pp. 25-26). The plaintiff therefore had ample opportunity to present his grievance to the replevin court.

As to interfering with his appeal in the replevin action, the plaintiff did timely file an appeal. He moved to withdraw that appeal, instead of seeking an order for his allegedly needed documents, or asking the court for an extension until he got those documents. The plaintiff cannot parlay his voluntary decision to withdraw his appeal into an access to the courts claim.

IV.     **On the present record, the defendants are not entitled to summary judgment on the plaintiff's claim that the withholding of his pattern books violates his First Amendment rights.**

     A.     *Res Judicata* **and/or issue preclusion**

The Court has little information on exactly what happened in the replevin action, other than the parties' recollection and parts of the docket sheet. Accordingly, the Court cannot tell whether the Judge addressed the First Amendment issues argued by the plaintiff, or granted judgment to the defendants on some other ground. Doctrines of *res judicata* or issue preclusion may apply, but that cannot be determined on the present record. In order to ensure that justiciable issues exist, the parties will be given another opportunity to move for summary judgment.

     B.     **There is not enough information in the record to determine whether the withholding of the pattern books withstands scrutiny under the First Amendment.**

Defendant Bryant avers that he refused the books because, "Iron-on transfers pose a security threat, as they can be used as symbols of security threat groups, also known as 'gangs', and can be used in tatooing the symbols. . . . Inmates can, and have been, disciplined for

15

receiving tatoos in prisons, or even for possessing tatooing equipment. . . I have the authority to either concur or not concur with the finding of the Central Publication Review Committee . . ." (D/e 59, Bryant Aff. ¶¶ 5-6).

"Courts owe 'substantial deference to the professional judgment of prison administrators.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006), *quoting Overton v. Bazzetta*, 539 U.S. 126 (2003). The plaintiff's claim to his books turns on whether the prison's refusal is "'reasonably related' to legitimate penological interests," and not an "exaggerated response." *Turner v. Safley*, 482 U.S. 78, 87 (1987), *quoted by Beard*, 126 S.Ct. At 2578. The *Turner* test is guided by considerations of: 1) whether a "valid, rational connection" exists between the restriction and the government interest; 2) whether the plaintiff has alternative means of exercising the right; 3) the impact on prison resources, guards and other inmates that accommodation of the right would have; and, 3) whether the government has "ready alternatives" to the restriction that would accomplish the same goal. *Beard*, 126 S.Ct. At 2578, *quoting Turner*, 107 S. Ct. 2254.[10]

The record is not developed enough to make this determination. In order to ensure justiciable issues exist for trial, the parties will be given another opportunity at summary judgment on this issue.

## V.    Plaintiff's Motion to Compel Discovery (d/e 63)

Two of the plaintiff's requests were already provided to him in the defendants' motion for summary judgment–copies of the letters for which he received disciplinary reports, and the reasons why the plaintiff was transferred. Those requests are therefore moot. His requests for a comparison of the inmate populations at Graham and Pinckneyville is irrelevant, because the court already assumes for purposes of this order that Graham has fewer violent inmates than Pinckneyville. His requests for disciplinary records of particular inmates at Pinckneyville is likewise irrelevant, as is his request for guidelines regarding placement of sex offenders, and guidelines for placing inmates in Pinckneyville. As discussed above, no reasonable inference arises that the plaintiff was transferred out of retaliation. The plaintiff's debate with Warden Bryant about the books had already been going on for over a year, and the replevin action had been going on for nearly eight months. He was transferred because of his letters calling the Warden a prick, incompetent, ignorant of the law, etc. The plaintiff implies that he should have been transferred to a different prison, but the plaintiff's placement is not for the Court's to decide. The plaintiff could have been transferred to a maximum security prison.

The plaintiff also seeks, for both Graham Correctional Center and Pinckneyville Correctional Center, the number of insolence tickets issued in 2003, the number of those tickets

---

[10]As the S.Ct. recognized in *Beard*, in some situations "the second, third, and fourth factors, being in a sense logically related to the Policy itself, . . . add little, one way or the other to the first factor's basic logical rationale."  126 S.Ct. at 2580.

that resulted in a loss of good time, and the number of these that resulted in segregation time.  He also seeks the number of inmates transferred from Graham "on an emergency basis as Lehn was rather than via the normal transfer method.  (In 2003)," along with the rationale for the emergency transfer, and whether those inmates had lawsuits against an IDOC employee (d/e 63, p.7).

The burden and expense of producing this discovery well outweighs any possible minimal benefit it might give to the plaintiff.  Determining the number of insolence tickets issued would require a review of every single inmate's file who spent time incarcerated in these prisons in 2003.  Graham's total average daily population is 1,906 (as listed now on the website), and Pinckneyville's is 2,052.  That is nearly 4,000 inmates (which does not even account for inmate turnover).  Further, the comparison of other inmates' insolent writings to the plaintiff's would result in needless and irrelevant inquiries, for the insolent writings would have to be nearly identical to the plaintiff's to have any meaning to this case, and, the inmates writing them would have to be similarly situated to the plaintiff.

There are a few requests that might arguably lead to relevant evidence, which the court has ordered to be produced below, to the extent not already produced.

IT IS THEREFORE ORDERED:

1) The defendants' motion for summary judgment is granted in part and denied in part (d/e 59).  The defendants are granted summary judgment on all of the plaintiff's claims **except for** his claims that:

        a) the refusal to allow him his five pattern books violated and continues to violate his First Amendment rights; and,

        b) Defendant Greenwood retaliated against the plaintiff for the plaintiff's protected First Amendment activities.

2) The following defendants are dismissed because they are not implicated in the two remaining claims: Gabeau, Brookshire, Price, Meyers, Klindworth and Fernandez.  The remaining defendants are: Bryant, Beck, Greenwood, Pierson, Evans, Flagg, and Walker.

3) The defendants' motion to strike is denied (d/e 71);

4) The plaintiff's motion to compel (d/e 63) is granted only to the extent he seeks:

    1)      "copy of the notice that Warden Steven C. Bryant  was required to send to the Director that he had overruled the Publication Review Committee (See Administrative Directive 04.01.108 A-J)."

    2)      "communication between Warden Steven C. Bryant and Pinckneyville CC

personel [sic] regarding Lehn's transfer.  (Record of calls, faxes and copies of documents)."  The plaintiff may move to reconsider the court's summary judgment on the retaliation claim regarding the transfer, if the documents produced allow an inference that retaliation motivated the transfer.

The defendants are directed to produce these documents, if they exist, by August 18, 2006.

5) In order to ensure that material issues of disputed fact exist for trial, the defendants are directed to file a summary judgment motion on the remaining claims by September 8, 2006.  The plaintiff may also file a summary judgment motion regarding his First Amendment claim, if he chooses, by September 8, 2006.

6) A final pretrial conference is scheduled for January 23, 2007, at 1:30 p.m. by video conference.  The proposed final pretrial order is due January 16, 2007.

7) A jury trial is scheduled for January 29, 2007, at 9:00 a.m., by personal appearance before the Court in Urbana.

Entered this <u>27th</u> Day of <u>July</u>, 2006.

**s\Harold A. Baker**
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE